IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:17-CV-00071-M

BELINDA LIPSCOMB FOUSHEE, *as*    )
*Personal Representative of the Estate of*  )
*Anneka Foushee*,    )
                  Plaintiff,   )
    )
v.    )
    )
R.T. VANDERBILT HOLDING    )      **OPINION AND ORDER**
COMPANY, INC., *Individually and as*  )
*Successor in Interest to R.T. Vanderbilt*  )
*Company, Inc.*, VANDERBILT    )
MINERALS, LLC, *f/k/a R.T. Vanderbilt*  )
*Company, Inc., Individually and as*  )
*Successor in Interest to International Talc*  )
*Co.*,    )
                  Defendants.  )

This matter is before the court on Defendants' Motion for Summary Judgment [DE-76].

For the reasons explained below, Defendants' motion is GRANTED.

I.     Abbreviated Procedural History

Belinda Lipscomb Foushee (hereinafter "Plaintiff") alleges that her daughter, Anneka

Foushee (hereinafter "Anneka"), contracted and ultimately died from an asbestos-related disease,

mesothelioma, after she was exposed to Defendants' asbestos-containing product found in ceramic

materials she used as a student at Appalachian State University ("ASU") in the mid-1990s. Compl.

¶¶ 7-8, 12-15, DE-1. The specific material in question, NYTAL 100 HR talc (hereinafter "NYTAL

100"), *see generally* Def.'s Am. Mem. in Supp. of the Mot. for Summ. J., DE-79, was allegedly

supplied to ASU by Defendants via a non-party to this lawsuit, Highwater Clays of Ashville, North

Carolina, (hereinafter "Highwater"). DE-1 ¶¶ 9-11.

1

On February 9, 2017, Plaintiff filed this federal suit against Defendants for negligent failure to warn, breach of implied warranty, negligent design, gross negligence, and wrongful death. *Id.* ¶¶ 17-58. Jurisdiction is based on diversity of citizenship and amount in controversy pursuant to 28 U.S.C. § 1332. *Id.* ¶ 5. Since filing suit almost four years ago, the parties have sought no less than nine extensions to the scheduling order. *See* DE-20, 26, 27, 30, 32, 55, 63, 65, 73.

The operative scheduling order [DE-74] allowed the parties to refile dispositive motions by September 11, 2020. By this deadline, Defendants filed this instant motion for summary judgment and associated briefing [DE-76 (motion), 79 (amended memorandum in support), 81 (statement of material facts)] and withdrew their previous motion at Docket Entry 45 [DE-80 (notice of motion withdrawal)]. Plaintiff responded in opposition on October 9, 2020 [DE-105] and supplied a response to Defendants' statement of material facts [DE-108]. Defendants replied in support of their motion on October 23, 2020 [DE-112]. Oral argument on the motion took place on December 8, 2020 [DE-125]. The motion is ripe for ruling.

II.     Factual Background

For the purposes of summary judgment, the court finds that the following facts are material and undisputed. Professor Eric Reichard (hereinafter "Reichard") is a master potter and long-time professor at ASU. Reichard Dep. at 10:6-16, 9:5-11. He has taught the Ceramic Technology course since approximately 1973. Reichard Dep. at 16:22-17:4. Anneka was enrolled in this course in the Fall of 1995 along with classmate Myah Drumm (hereinafter "Drumm"). Pl.'s Ex. 2, DE-108-3 (Anneka Transcript) & Pl.'s Ex. 8, DE-108-9 (Drumm Transcript). The class met twice a week, on Mondays and Wednesdays, from 10 am to 11:50 am. Reichard Dep. at 17:9-16. Class would usually begin with a project demonstration by Reichard; Reichard then walked through the studio monitoring students and providing feedback as they each began to replicate the work. Drumm Dep.

2

at 39:20-40:5. During the course, students would have the opportunity to work with clay products and glazes, but not raw talc or slip. Reichard Dep. at 18:8-20; 23:8-11.

The course also had a lab component, providing students additional studio time in which to complete projects for the course. Reichard Dep. at 17:17-22. Drumm recalled that students were advised to spend roughly three hours in the studio, in addition to class time, to complete work for the course. Drumm Dep. at 14:16-15:6, 81:2-6. The semester was approximately fourteen weeks long. Drumm Dep. at 74:25-75:8; Reichard Dep. at 63:7-13.

Since the 1970s, Reichard purchased most of the supplies necessary for his ceramics course from Highwater. Reichard Dep. at 26:8-15, 30:21-24. Though sales records for this time period do not exist, supplies purchased by ASU from Highwater would have included clay and raw talc. Reichard Dep. at 26:16-27:3 (clay and chemicals such as silica), 36:14-20 (talc). Reichard only purchased mid-range to high-range stoneware clays from Highwater. Reichard Dep. at 39:14-19. Stoneware clay was the only type of clay used in his course. Reichard Dep. at 41:17-22. Reichard speculated that certain stoneware clay could have contained talc as an ingredient but was uncertain as that was considered proprietary information. Reichard Dep. at 51:10-24. Reichard used raw talc as a component ingredient for the glazes he mixed in a designated area of the studio. Reichard Dep. at 36:11-24; *see also* Pl.'s Ex. 16, DE-108-17 (Reichard's Glaze Recipes). His students did not work with talc. Reichard Dep. at 18:14-20.

Highwater blended clays, and clay bodies, then sold these clays and related equipment to its customers. B. McCarthy Dep. at 9:21-10:5. Highwater purchased the raw materials necessary to manufacture clays from various sources. B. McCarthy Dep. at 12:18-23. One such material was NYTAL 100 purchased from Defendants. B. McCarthy Dep. at 12:24-13:2; 16:6-10. In 1995 specifically, Highwater purchased 302,000 pounds of NYTAL 100 from Defendants. Pl.'s Ex. 14

3

at 4, DE-108-15 (Vanderbilt sales records to Highwater, 1985-2000). The owners of Highwater, Brian and Gail McCarthy (hereinafter "B. McCarthy" and "G. McCarthy," respectively) no longer have documentation or recipes indicating the ingredients used to make the various types of clays they manufactured and sold. B. McCarthy Dep. at 18:20-20:4; G. McCarthy Dep. at 94:19-95:14. They did recall one specific clay that incorporated NYTAL 100: white earthenware clay. G. McCarthy Dep. at 22:2-19; B. McCarthy Dep. at 16:21-17:21. White earthenware clay was not purchased by universities because it was a low-fire clay and universities primarily used high-fire clays. B. McCarthy Dep. at 40:17-42:17. Talc would not be an ingredient in high-fire clays because of its melting point; it is therefore primarily an ingredient in low-fire, white clays. *Id.* B. McCarthy did not rule out the possibility that there were other Highwater clays, besides the white earthenware clay, that also contained talc as an ingredient. B. McCarthy Dep. at 31:22-32:9. Highwater resold Defendants' NYTAL 100 to its customers. G. McCarthy Dep. at 82:7-10. Defendants' description of NYTAL 100's packaging—fifty-pound brown paper bags—matched the description of the talc packaging provided by B. McCarthy, G. McCarthy, and Reichard. Pl.'s Ex. 13 at 4, 7, DE-108-14 (Defendants' Answers to Interrogatories); B. McCarthy Dep. at 15:23-16:10; G. McCarthy Dep. at 34:5-24; Reichard Dep. at 62:9-23, 65:9-24.

The ceramics studio was dusty; Drumm testified that "there was dust from the clay that was sort of in the air. It wasn't billowing out, but it was something that you could taste and smell . . . ." Drumm Dep. at 22:13-16. The dust was attributed to dry clay. Drumm Dep. at 22:13-20, 24:2-5, 31:9-21, 33:2-14, 44:17-22. It was common practice for students to wear an apron in the ceramics studio and Drumm wore an apron while she worked in the studio. Drumm Dep. at 26:5-10. Drumm took ceramics courses in the Fall of 1995, in the Spring of 1996, and also testified that she completed an "incomplete credit" in the Fall of 1996. Drumm Dep. at 7:9-16, 61:24-62:5.

4

Drumm wiped her hands off on the apron as she worked with clay or got "spatter" on it from the clay she was working with. Drumm Dep. at 27:4-12. Most of the time Drumm would not wash her apron, she would simply brush off the flakes of clay residue. Drumm Dep. at 27:13-19. At a certain point in time—unclear from the record—Drumm stopped washing her apron altogether, but she testified that the apron would still have residue from the class she specifically took in the Fall of 1995. Drumm Dep. at 28:7-12. Before being turned over for inspection and testing, Drumm kept the apron rolled up in a plastic bag that was stored in a box since her time as a student. Drumm Dep. at 28:13-21.

Dr. William Longo analyzed residue from Drumm's apron. *See, e.g.*, Pl.'s Ex. 17, DE-108-18 (Dr. Longo 2018 Expert Report). Testing revealed the presence of both anthophyllite and tremolite asbestos fibers on the apron, at a concentration of "22,600,000 fiber bundles per gram of the clay composite." *Id.* at 3, 4. Although the presence of talc on the apron could not be verified by Dr. Longo and his team, they concluded that the source of the asbestos fibers found on the apron was Defendants' NYTAL 100, based on number of things, including a review of the deposition testimony and record evidence in the case and specialized comparison testing performed on a 2004 sample of NYTAL 100. Pl.'s Ex. 19, DE-108-20 at 3-6 (Dr. Longo 2020 Expert Report). Dr. Longo's testing also confirmed that bystanders would be exposed to airborne asbestos fibers when NYTAL talc was poured into a plastic bucket using two to three continuous pouring motions—simulating how students could have occupational exposures if present in the studio during the mixing of glazes. DE-108-18 at 11.

Anneka was diagnosed with cervical cancer in 1998. Defs.' Ex. E, DE-79-5 (Anneka' CT scan records, 1998). For this she was treated with a combination of radiation and chemotherapy. *Id.* at 3-4; *see also* Pl.'s Ex. 30 at 1, DE-108-31 (Dr. Finkelstein Expert Report). Anneka was

5

diagnosed with peritoneal mesothelioma in July 2014, a rare disease with known causes that include the inhalation of erionite and fluoro-edenite fibers, therapeutic radiation, and inhalation of asbestos. Pl.'s Ex. 30, DE-108-31 at 3, 27. Anneka passed away in February 2015 at the age of forty-one with peritoneal mesothelioma as the cause of death. Pl.'s Ex. 32, DE-108-33 (Death Certificate).

III.    Legal Standards

A.  Summary Judgment Legal Standard

If "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" the court shall grant summary judgment. Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotations and citations omitted). The court's role at the summary-judgment stage is not "to weigh the evidence and determine the truth of the matter" but instead "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this initial burden, the burden then shifts to the nonmoving party to point out "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec.*

6

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting the Federal Rules of Civil Procedure). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324. While "it is the province of the jury to resolve conflicting inferences from circumstantial evidence[,] [p]ermissible inferences must still be within the range of reasonable probability." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958), *cert. denied*, 358 U.S. 908 (1958). It is "the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Id.*

B. North Carolina Law of Causation in Asbestos Cases

A district court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). "In tort actions, North Carolina courts adhere to the rule of lex loci and apply the substantive laws of the state in which the injuries were sustained." *Johnson v. Holiday Inn of Am., Inc.*, 895 F. Supp. 97, 98 (M.D.N.C. 1995); *Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 854 (N.C. 1988) ("This Court has consistently adhered to the lex loci rule in tort actions."). Anneka's alleged exposure to the Defendants' product occurred in North Carolina, as did the mesothelioma diagnosis. Accordingly, the court will apply North Carolina's substantive law.

The North Carolina Supreme Court has said that a plaintiff in an asbestos case "must demonstrate that he was actually exposed to the alleged offending products. It will not be enough for plaintiff simply to show that various products were shipped to various job sites on which he

7

worked." *Wilder v. Amatex Corp.*, 314 N.C. 550, 553-54, 336 S.E.2d 66, 68 (N.C. 1985). The Fourth Circuit has recognized that requiring direct evidence of product identification is unreasonable and that circumstantial evidence can instead be used to establish a plaintiff's exposure to a specific product. *See Roehling v. Nat'l Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d 1225, 1228-29 (4th Cir. 1986) (finding that a reasonable inference could be drawn to establish that plaintiff was in the same limited area as those witnesses who could specifically identify defendants' products as causing the asbestos dust in that discrete area); *but see Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1163 (4th Cir. 1986) (holding that invoice evidence, standing alone, was not sufficient to establish that a particular product was a substantial contributing factor where invoices showed only the purchase of asbestos-containing product, but not when or where the product was used).

In a similar vein, the Fourth Circuit, in the asbestos context, has held that once a specific product has been identified, "there must be evidence of exposure to [that] specific product on a *regular* basis *over some extended period of time* in *proximity* to where the plaintiff actually worked." *Lohrmann*, 782 F.2d at 1162-63. This test is often referred to as the "frequency, regularity, and proximity test." *See, e.g.*, *Pace v. Air & Liquid Sys. Corp.*, 642 F. App'x 244, 247 (4th Cir. 2016) (internal quotations omitted). Though the *Lohrmann* case involved Maryland law, the Fourth Circuit found the test to be equally applicable in cases based on North Carolina law. *Jones v. Owens-Corning Fiberglas Corp. & Amchem Prods., Inc.*, 69 F.3d 712, 716 n.2 (4th Cir. 1995). Furthermore, though the *Lohrmann* case involved a different asbestos-related disease, asbestosis, "federal courts in North Carolina have routinely applied *Lohrmann*'s 'frequency, regularity, and proximity' test to evaluate proximate causation in asbestos cases, including those involving mesothelioma, arising under North Carolina law." *Connor v. Norfolk S. Ry. Co.*, No.

8

1:17CV127, 2018 WL 6514842, at *3, n.5 (M.D.N.C. Dec. 11, 2018), *appeal filed* No. 19-1015 (4th Cir. Jan. 4, 2019) (collecting cases); *see also Pace*, 642 F. App'x at 247-48 (applying the *Lohrmann* test in a mesothelioma case under South Carolina tort law).

Whether there is sufficient evidence in the record to satisfy the "frequency, regularity, and proximity" test is a legal determination. *Compare Haislip v. Owens-Corning Fiberglas Corp.*, 86 F.3d 1150, at *1-3 (4th Cir. 1996) (unpublished table decision) (finding evidence of being fully covered with asbestos dust each day, generated from cutting newly-installed pipes, nine hours per day, five days per week, over a nine-month period sufficient to support the jury's verdict that there was exposure with the requisite frequency, regularity, and proximity); *Jones*, 69 F.3d at 716 (exposure to asbestos dust on a daily basis for approximately twenty years); *Yates v. Air & Liquid Sys. Corp.*, No. 5:12–cv–752–FL, 2014 WL 4923603, at *22, 25 (E.D.N.C. Sept. 30, 2014) (finding daily exposure, multiple times each day, to visible dust from an asbestos-containing product over a five-month period meets the *Jones/Lohrmann* test) *with Lohrmann*, 782 F.2d at 1163 (finding insufficient exposure to asbestos dust from a pipe covering product on ten to fifteen occasions of between one and eight hours of duration); *Smith v. 3M Co.*, No. 1:16CV379, 2019 WL 1116718, at *4 (M.D.N.C. Mar. 11, 2019) (finding that eighteen months of work as a pipefitter on a construction site, including eight months of significant insulation work that involved cutting insulation which occasionally created dust that could have been inhaled, too vague and speculative to satisfy the *Lohrmann* test), *appeal filed*, No. 19-1391 (4th Cir. Apr. 15, 2019); *Young v. Am. Talc Co.*, No. 1:13CV864, 2018 WL 9801011, at *5 (M.D.N.C. Aug. 3, 2018) (granting summary judgment where evidence showed exposure to Defendant-attributable asbestos on just thirteen specific instances with missing information regarding the length of the exposures).

9

To meet this evidentiary burden, a plaintiff must demonstrate what is probable. *See Sakaria v. Trans World Airlines*, 8 F.3d 164, 172-73 (4th Cir. 1993) ("In a long line of decisions in this circuit, we have emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility,' precisely to guard against raw speculation by the fact finder."). Earlier this year this court further explained that when an injury may have more than one cause, "the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough." *Cahoon v. Edward Orton, Jr. Ceramic Found.*, No. 2:17-CV-63-D, 2020 WL 918753, at *7 (E.D.N.C. Feb. 24, 2020) (internal quotations and citation omitted).

IV.     Analysis

Defendants' make three arguments in their Motion for Summary Judgment: (1) no product attributable to the Defendants has been appropriately identified, (2) assuming product identification has been established, there was no exposure to the product with the requisite frequency, regularity, and proximity, and (3) there is an alternative cause of Anneka's mesothelioma.

The Defendants argue the NYTAL 100, though sold to Highwater during the relevant time period, was not incorporated into any clay product Highwater sold to ASU. DE-79 at 8-9. They rest this argument on the fact that NYTAL 100 is an ingredient used only in low-fire, earthenware clays. DE-81 ¶ 4. Universities in general, and ASU in particular, purchased mid- to high-fire, stoneware clays. *Id.* ¶¶ 4, 7. While Professor Reichard purchased raw talc from Highwater in order to make glazes, students did not directly work with talc. *Id.* ¶ 6.

On the other hand, Plaintiff claims there is evidence to support the fact that NYTAL 100 was an ingredient incorporated into clays sold to ASU and was a raw ingredient purchased directly by ASU for use in glazes, which students would have been exposed to even if they did not directly engage in mixing glazes. DE-105 at 18, 21-22. Plaintiff further contends that testing on Drumm's apron, preserved from her time as a student in the same class as Anneka, confirmed the presence of asbestos fibers anthophyllite and tremolite. *Id.* at 18-19. This "matched the signature of Vanderbilt's NYTAL 100HR talc" because Vanderbilt talc, including NYTAL 100HR, has been tested extensively by MAS [Materials Analytical Services, LLC] as well as other industrial and scientific groups. *Id.*

Sales records from the relevant time period confirm that Highwater purchased NYTAL 100 from Defendants. DE-108-15 at 4. However, there are no corresponding sales records from Highwater to ASU to confirm which clays were sold to the university and whether or not raw talc was sold in 1995 or the surrounding time period. Nor are there Highwater recipe cards or testimony to definitively confirm the universe of clays that incorporated NYTAL 100 as an ingredient. *See, e.g.*, B. McCarthy Dep. at 18:20-19:6. There are recipe cards available from Professor Reichard that list "talc" as an ingredient in various glaze recipes. Pl.'s Ex. 16, DE-108-17 (Reichard's Glaze Recipes).

Professor Reichard confirmed that ASU purchased most ceramics supplies from Highwater since the 1970s. Reichard Dep. at 26:8-15, 30:21-24. Professor Reichard testified that ASU only purchased mid-range to high-range stoneware clays from Highwater. Reichard Dep. at 39:14-19. The McCarthys recalled only one specific clay that incorporated NYTAL 100: white earthenware clay. G. McCarthy Dep. at 22:2-19; B. McCarthy Dep. at 16:21-17:21. B. McCarthy testified that this was not a clay purchased by universities. B. McCarthy Dep. at 40:17-42:17. However, he did

11

not rule out the *possibility* that other Highwater clays contained talc as an ingredient, B. McCarthy Dep. at 31:22-32:9, which seems plausible given the quantity of talc purchased by Highwater during the relevant time period. DE-108-15 at 4 (indicating 302,000 lbs. of NYTAL 100 purchased in 1995).

Professor Reichard testified that raw talc was also purchased from Highwater and was mixed in the glazing area of the ceramics studio to create glazes. Reichard Dep. at 36:11-24. Professor Reichard's description of the talc packaging matched descriptions provided by both the McCarthys and Defendants suggesting a high probability that this raw talc was NYTAL 100. *Compare* Reichard Dep. at 62:9-23, 65:9-24 (50-pound brown bags) with B. McCarthy Dep. at 15:23-16:10 (50-pound bags); G. McCarthy Dep. at 34:5-24 (50-pound bags); DE-108-14 at 4, 7 (50-pound brown paper bags). While Professor Reichard said that students did not come into direct contact with talc, Reichard Dep. at 18:14-20, testing done by Plaintiff expert Dr. Longo suggests that students could have been exposed to airborne asbestos fibers released during the mixing of glazes, DE-108-18 at 11. Furthermore, Dr. Longo's testing revealed the presence of high concentrations of asbestos fibers on the apron—worn by Drumm during the ceramics course in the Fall of 1995 and in subsequent semesters—and opined that Defendants' NYTAL 100 was the source of those asbestos fibers. DE-108-18, DE-108-20; Drumm Dep. at 7:9-16, 61:24-62:5.

Based on this evidence, and all inferences drawn in the light most favorable to the Plaintiff, a reasonable jury could conclude that Defendants' NYTAL 100 product was present in the ASU ceramics studio in 1995 and that Anneka was exposed to it by virtue of her participation in the class. Based on the evidence and all inferences drawn in the light most favorable to the Plaintiff,

the most likely vehicle of transmission of the asbestos fibers in the studio was through the use of NTYAL 100[1] as a component ingredient in glazes.

However, Plaintiff has failed to forecast evidence sufficient to demonstrate the length of the exposures. There is no evidence regarding the exact length of the academic semester in the Fall of 1995 but based on the record the court will assume it lasted fourteen weeks. Plaintiff posits that it was "a twenty-something week semester," DE-105 at 23, but the offered citations to the record do not discuss the length of the semester, only the length of the course itself and the associated lab component. Additional testimony suggests that the semester was approximately fourteen weeks long. *See* Drumm Dep. at 74:25-75:8 ("Ms. Foushee was just in this class for . . . three and a half months potentially? A. Sure."); *see also* Reichard Dep. at 63:7-12 ("The fall semester at [ASU], would that take place from September to December? A. Yes, sir. I think it is August, but . . . Q. August to December? A. The first of December; yes, sir."). The class met twice a week for a total of three hours and forty minutes per week, Reichard Dep. at 17:9-16, and Anneka was enrolled in and passed the course, DE-108-3 at 2, but there is missing information regarding Anneka's attendance record.[2] Also unknown is the number of hours Anneka specifically spent in the "lab" portion of class. Testimony suggests that this was not monitored time, but rather an opportunity for students to continue work on projects that they did not complete during the allotted class time. *See* Reichard Dep. at 17:17-22 ("Q. During the Ceramic Technology course was there also, for lack of a better term I will use lab hours where students could come into the classroom and continue

---

[1] For purposes of the present motion, Defendants did not contest the assertion that their NYTAL 100 product contained asbestos but reserved the right to do so should the case proceed to trial. Hr'g Tr. at 37:7-12, DE-126.

[2] Plaintiff's counsel did point out at oral argument that Anneka received a grade of "B" for the ceramics class, implying that she must have regularly attended class as well as the lab portion to receive such a high grade, especially when compared to the rest of her academic transcript. Hr'g Tr. at 20:1-5, DE-126.

the projects that they had for the course? A. Yes, sir."); *see also* Drumm Dep. at 14:16-15:6 (discussing that students were advised to complete three hours of open studio time in addition to class time); Drumm Dep. at 81:2-6 (stating that Drumm did not remember if lab attendance was required to pass the ceramics course). Viewing this evidence and all rational inferences in the light most favorable to Plaintiff, Anneka spent a maximum of six hours and forty minutes in the ceramics studio per week for a total of fourteen weeks. Rounding up, this equates to a maximum of 94 hours in the ceramics studio, or ten, nine-and-a-half-hour days. *See Lohrmann*, 782 F.2d at 1163 (finding insufficient exposure to asbestos dust from a pipe covering product on ten to fifteen occasions of between one and eight hours of duration); *Smith*, 2019 WL 1116718, at *4 (finding that eighteen months of work as a pipefitter on a construction site, including eight months of significant insulation work that involved cutting insulation which occasionally created dust that could have been inhaled, too vague and speculative to satisfy the *Lohrmann* test); *Young*, 2018 WL 9801011, at *5 (granting summary judgment where evidence showed exposure to Defendant-attributable asbestos on just thirteen specific instances with missing information regarding the length of the exposures).

Importantly however, total time spent in the ceramics studio does not equate to total time of asbestos-exposure. The testimony regarding the airborne dust that was pervasive in the studio pertained to clay. Drumm Dep. at 22:13-20, 24:2-5, 31:9-21, 33:2-14, 44:17-22. As discussed above, the most likely vehicle of transmission of asbestos fibers from NYTAL 100 into the studio was through the use of NTYAL 100 as a glaze component. The reasonable inference is that Professor Reichard would not have been mixing glazes using NYTAL 100 during the allotted class time of one hour and fifty minutes twice per week based on testimony that the Professor would begin each class by demonstrating the day's project and then walk around to monitor student

progress. Drumm Dep. at 39:20-40:5. There has been no evidence presented to show the number of times throughout a semester Professor Reichard mixed glazes using talc, whether he did so while students were physically present in the studio (thereby potentially being exposed to airborne particles), whether Anneka in particular would have been in the studio at those times, the frequency with which Anneka would have used the already-mixed, wet glazes herself, and how and whether the already-mixed glazes could release asbestos fibers from incorporated talc and furthermore to be inhaled to a sufficient degree. That Anneka attended class and lab regularly and that a classmate's apron—worn during two, and possibly three semesters—was heavily contaminated with asbestos fibers is insufficient for *Lohrmann*. Expert testimony regarding the extent of asbestos fibers found on the Drumm apron presumed as a foregone conclusion the sufficiently of the length of exposure and is therefore not helpful to the court. In short, based on the extent of missing information, no reasonable jury could conclude from the evidence presented to this court that Anneka was exposed to NYTAL 100 with the necessary frequency, regularity, and proximity, such that it was the probable cause of her later development of mesothelioma. It is therefore "the duty of th[is] court to withdraw the case from the jury [because] the necessary inference[s are] so tenuous that [they] rest[] merely upon speculation and conjecture." *Ford*, 259 F.2d at 266. Given this determination, the court will not address the Defendants' final argument regarding an alternative cause of Anneka's mesothelioma.

15

V.    Conclusion

For the reasons outlined above, the Court GRANTS Defendants' Motion for Summary Judgment [DE-76]. In light of this, the outstanding motions in limine at Docket Entries 85, 87, 89, 91, 93, 95, 97, 98, 100, and 103 are hereby DENIED as moot. Plaintiff's claims against Defendants are hereby DISMISSED. The clerk shall close the case.

SO ORDERED this the 16th day of December, 2020.

RICHARD E. MYERS II
UNITED STATES DISTRICT JUDGE